IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | |
| ) | 1:15cr26 |
| JOHN JONES ) | |
| ) | |
| Defendant. ) | |

<u>SENTENCING POSITION</u>

COMES NOW, the defendant, John Jones, and respectfully joins the government in its sentencing recommendation of probation in this case. We observe that

> a joint recommendation at sentencing carries much more weight than a recommendation offered only by the defendant. A joint recommendation, as opposed to one solely made by a defendant in pursuit of his own interests, is more persuasive to the undersigned because it reflects that the government, an entity charged with protecting the public and promoting society's interests, finds that the recommended sentence meets these interests. The Court relies on the government, as well as the defendant, for this perspective in order to craft a sentence that is no greater than necessary.

*United States v. Katzer*, No. CR 16-25-M-DLC, 2017 WL 2418264, at *3 (D. Mont. June 2, 2017); *United States v. Soto*, No. 09-CR-292, 2010 WL 1780313, at *4 (E.D. Wis. Apr. 30, 2010) ("the Court gives significant deference to joint recommendations of both the prosecution and the defense"); *United States v. Camarillo–Tello,* 236 F.3d 1024, 1028 (9th Cir.2001) ("[W]hen the sentencing court hears that both sides believe a certain sentence is appropriate and reasonable in the circumstances, this is more persuasive than only the defendant arguing for that sentence.") *Levin v. Mississippi River Corp.*, 59 F.R.D. 353, 366 (S.D.N.Y.) (a "joint recommendation is entitled to substantial weight."). The defendant further avers as follows:

I. PSR Objections

The defendant has no objections to the final version of the PSR.

II. Departure provisions

A. A departure is warranted pursuant to U.S.S.G. §5H1.1 and §5H1.4 (age and health).

As set forth on the last page of the final PSR:

> Medical records provided by the defendant reflect he has been diagnosed with a congenital heart anomaly, tricuspid valve disorder, atria lymphadenopathy, orthostatic hypotension, coronary arteriosclerosis in native artery and mitral valve disorder. The defendant also has a history of degenerative disc disease and suffers from sciatica, which causes the defendant severe lower back pain and thigh pain. The defendant's medical records reflect he is taking the following medications: Alprazolam (.05mg); Diltiazem (240mg); Lipitor (10mg); Omega (1,200mg); Pradaxa (150mg); Tamsulosin (.04mg); and Levothyroxine (75mg).
>
> Presentation of the following information does not necessarily constitute a recommendation by the Probation Office for departure. Although the Probation Office did not note any grounds for departure in the initial presentence report disclosed in 2015, the defendant will be 80 years-old at the time of sentencing. He has been diagnosed with a myriad of physical health conditions, which require continued medical care and medication monitoring. Therefore, the defendant's age and physical health may warrant a departure from the prescribed sentencing guidelines pursuant to U.S.S.G. §5H1.1 and §5H1.4.

In view of these circumstances we believe a departure is appropriate. We note that the day of the sentencing in this case will be Mr. Jones 80th birthday. We also point out that the Department of Justice itself has recently established that aging inmates (classified as age 50 or older) are substantially more costly to incarcerate than inmates age 40 and younger:

> We found that this cost differential is driven by increased medical needs, including the cost of medication, for aging inmates. BOP institutions with the highest percentages of aging inmates in their population spent five times more per inmate on medical care ($10,114) than I institutions with the lowest percentage of aging inmates ($1,916). BOP institutions with the highest percentages of aging inmates also spent 14 times more per inmate on medication ($684) than institutions with the lowest percentage ($49).

*See* Department of Justice, Office of the Inspector General, Report on the Impact of an Aging Inmate Population on the Federal Bureau of Prisons, at ii (May 2015). In addition to its financial findings, the investigation also revealed that the BOP (1) does not have the appropriate level of staff to meet the needs of its aging population, (2) is not physically equipped to house elderly inmates, and (3) does not provide adequate programming opportunities for aging inmates.

B. Departure pursuant to U.S.S.G. §5H1.11 (military service)

Under U.S.S.G. § 5H1.11 "Military service may be relevant in determining whether a departure is warranted" if individually or combined with other factors "is present to an unusual degree and distinguishes the case from the typical cases covered by the guidelines". For the reasons more thoroughly set forth in the attached letters, we submit such a departure is warranted in the instant case.

III. Variance under Section 3553(a)

Counsel reincorporates all of the above arguments in support of a variance as an alternative to a departure. A variance is further appropriate in light of the extraordinary background and characteristics of the defendant, captured in the numerous attached letters. A small handful of those letters are cited below.

Thomas Principe, a National Guard Officer and former Deputy Chief prosecutor handling homicide cases writes:

> In nearly 40 years of association with General Jones in the military and in personal friendship I have seen him reach out to help both soldiers and civilians with a fervor and sense of mission unmatched in my experience. . . .
> General Jones was the third African American to be promoted to the rank of Brigadier General in the New York Army National Guard. During the time he was rising through the ranks, just to achieve the rank of Colonel made him a civil rights pioneer, not through activism, but by being a competent and engaging commander that promotion worthiness overcame

3

racial bias, even in those early days of integration of African Americans into the officer corps. General Jones helped break the ceiling for African Americans (and therefore all other minorities) in the military officer ranks with a cohesive, inclusive style command style of tolerate firmness…

General John L. Jones is one of the rare individuals in this world who works to better the lives of those less fortunate. I have seen him do so in the following ways:

> For many years he was a TAC Officer, training future officers at the Empire State Military Academy, the National Guard officer training school.
>
> As a commander, promoted active military support of veterans, impressing upon soldiers the importance of attending and participating in military holiday observances with veterans and fostering a sense of collegiality in inclusion which is rare in active military commanders.
>
> He was a commander of the National Guard Youth Challenge Program at Camp Smith, New York, working with youthful offenders to help them achieve GED equivalency and guiding them to lead a more orderly and less violent life. I spoke to these young people many times at General Jones' request.
>
> In 1999, following retirement from the New York Army National Guard, General Jones volunteered his time at a facility for brain injured individuals near Fr. Belvoir Virginia. In his pursuit of lifting the spirits of these injured persons sunk in hopelessness, no task was too menial. He devoted hours of his time offering quiet words of encouragement to persons struggling to emerge from the fog of trauma.

Mr. Jones' pastor provides "some examples of Jack's faithfulness and generosity:"

> In 2011, we sent a short term missions team to minister in Kenya Africa. Of the 12-14 people who went, General Jones, covered all or nearly all of the transport and lodging expenses for these volunteers. This amounted to thousands of dollars in support.
>
> A year later or so, he contributed to our "Health Ministry Team" which conducts events to promote physical health and fitness in our church and community.
>
> Additionally, he has been a generous supporter of a ministry affiliated with our church, ministering to abandoned infants and children in South Africa called "The Havens."

4

> For some while, he served on our "Security Team" which directs traffic on Sunday mornings in and out of our parking lots (we have 4 services) and secures the overall security of the building on Sundays. At his age, this subjected him to the elements and represented a real physical investment for a man of his age.
>
> I also know that he consistently supports his daughter's faith-based organization that ministers to battered women. . . the word that characterizes him best is "humble."

The Chief of Police of New York, Donald Singer writes that he

> [K]nows of his work with the Salvation Army, especially around the holidays. I watched him help literally hundreds of young boys and girls in the "Challenge" Program of the New York Army National Guard where young people who were losing their way were taken into the program and challenged and put on the right path to succeed in life, largely on account of the hard work and dedication of Jack Jones. As president of the 42nd Infantry Division Association, Mr. Jones made sure the widows of soldiers who had served in the division were taken care of and he made sure that deceased soldiers received proper honors for their service in the Armed Forces of the United States. On several occasions, he directed memorial services for those who served and died as members of the Division from World War I, World War II, and in Iraq. In my over thirty-two years of police service here in New York and over twenty five years of active and reserve National Guard service, I have come into contact with many individuals, but none more kind and caring than John L. Jones.

Volunteers from the Salvation Army note that they met John:

> [V]olunteering for the Salvation Army's year Toyland project for disadvantaged children here in Fredericksburg. Jack, seeking a way to volunteer at the grass roots level to help those less fortunate in our community. . . pitched right in cheerfully and enthusiastically, helping fill and lift huge bags of toys and clothes for 1500+ children for many days. Seeing an extra need when we were running short, he also purchased an untold amount of toys and clothes on his own to help out.
> . . .
> He never looks for anyone to return favors or generosity at all. As a matter of fact, anonymous donations to the Salvation Army have been made we can only conclude must have come from him, though he will never take credit. Nor does his charity and love of people stop with the Salvation Army. On a visit to our home, he met our new neighbors who had suffered loss in a fire—a husband who is disabled, a wife needing a job and three young children. Some of us in the neighborhood pitched in with household goods and such, but Jack, who didn't even know these neighbors, returned to our house the next day saying he felt a call to help them. He presented

> the husband with funds to help tide them over. We never knew the amount, but tears welled up in the husband's eyes. Jack asked for no thanks, but just when they were better off, to "pass it on" to others in need one day. As a matter of fact, he wanted us to present his gift to our neighbor but we insisted he do it. That's the Jack we know so well. He is a humble man of great faith who wants to share his blessings and give others a hand up in life, going wherever he feels God is leading him.
> . . .
> We are aware that on the frigid nights of this past winter, he would go out with a church near his home to minister with food and warm clothing to those homeless who were determined to stay out in the elements. Understanding that Jack has real physical problems with his back and heart, he nevertheless is not deterred from serving his fellow man.

John's daughter writes about the following experiences with her father:

> Honoring Soldiers—We have been out to lunch or dinner and dad will see a group of young officers eating. He will secretly pay the bill for them. On one of those occasions, a young soldier came running out with tears in his eyes and said "Sir, why thank you!"….Dad merely said "You're welcome son, thank you for your service," and never stated his own rank. As we walked away I turned back and whispered to the young man "He's a general." The young man then RAN in front of us and did one of the most perfect salutes! It brought tears to my eyes!
>
> My cousin Joanna Bell—Founder and President of Harvest For the World Food Bank in NYC. "Uncle John is the best he donated for us to get a brand new 12 passenger van for the use to pick up more homeless clients and carry more food! He's awesome!"
>
> Barbara W. at Church—"Your dad is a blessing! He surprised us by finding a manufacturer that provides a custom motorized lift for my husband [a military quadriplegic] to replace our old one that was falling apart! We cried tears of joy because I no longer have to lift him myself out of the van!"
>
> Fred the Falls Church Police Officer—"Are you Jack's daughter?" "Yes…" "Your Dad's a good man, he paid my mortgage once when I came upon a hard time. My God bless him."

The remaining letters echo these qualities illustrated above, and paint a picture of someone who has led a truly exemplary life.

Lastly we believe a sentence of probation would avoid unwarranted sentencing disparities. At trial, Mr. Jones testified that the meeting agenda was distributed on the day of the meeting, and

6

it contained a bullet point for Porter. 4/15/16 Tr. 973-75. Jones "put a question mark there [on the agenda, at the beginning of the meeting] because I said, what are we talking about Porter for?" *Id*. at 975. Jones testified that the discussion of Porter at the Board meeting "was about paying him for the contracts that he gave favor towards MPSC." *Id*. at 977. Jones "gathered it during the time of the conversation" but "had nothing to say in reference to that because they [the other Board members] had dealt with [Porter] on this area." *Id*. When the vote occurred at the end of the discussion, Jones "didn't vote, but I didn't say no either in that sense." *Id*. Jones subsequently testified that at the MPSC Board meetings, everybody would always voice a "yes" or "no" vote, meaning "[e]ither they agreed with whatever the decision was going to be or disagreed." *Id*. at 981. The prosecutor then asked Mr. Jones to elaborate:

> Well, I was part of the – I mean, I belonged to the organization, I'm a member, I'm a 25 percent owner, and I was there present during the conduct of this meeting, and I agree to what was stated about paying Rob Porter. And I felt myself just as guilty. 4/15/16 Tr. 978-79.

His acceptance of responsibility statement restates the facts:

> Although I was not directly involved in any part of the bribery scheme, or in any interaction with Colonel Porter, I benefitted financially from the award of the contracts. I first became aware of the bribe to Colonel Porter at the July 9, 2014 meeting, when another member of the Board of Directors raised the issue of paying Colonel Porter for his prior award of a contract to MPSC. At the conclusion of that meeting, I regrettably voted to pay Colonel Porter the 1% 'commission' for awarding that contract while he was employed with the Guard.

This conduct is far less serious than the many individuals who were ultimately acquitted at trial and were therefore not sentenced, and is also less serious than the case of Theresa Ogreen who was sentenced to two years supervised probation with 90 days home confinement without electronic monitoring. In that case, unlike in this case, the government did not request a sentence of probation, but the Court nonetheless gave a noncustodial sentence.

Conclusion

For the aforementioned reasons, we respectfully request that the Court impose the jointly recommended sentence of probation in this case.

Respectfully Submitted,

_/s/ John Zwerling_____
Cary Citronberg
John Zwerling
Zwerling/Citronberg P.L.L.C.
114 North Alfred Street
Alexandria, VA 22314
703-684-8000 (office)
703-684-9700 (fax)
jz@zwerling.com

**CERTIFICATE OF SERVICE**

I hereby certify that on this 22nd day of February, 2018 a copy of the foregoing was filed by ECF, which shall serve notice upon all parties.

_/s/ John Zwerling_____
Cary Citronberg
John Zwerling
Zwerling/Citronberg P.L.L.C.
114 North Alfred Street
Alexandria, VA 22314
703-684-8000 (office)
703-684-9700 (fax)
jz@zwerling.com